# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERRIE L. MOON, | CASE NO. 1:10-cv-02147-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Sherrie L. Moon, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.  Following review of the record as a whole and applicable law, this Court affirms the agency's determination to deny benefits to Plaintiff.

**I.      Administrative Record**

    **A.      Procedural History**

Plaintiff is insured under the Act through March 30, 2012. On October 3, 2007, Plaintiff filed for disability insurance benefits, alleging disability beginning January 12, 2007.  Her claim was initially denied on April 4, 2008, and upon reconsideration, on July 30, 2008.  Plaintiff appeared and testified at a hearing on December 22, 2009.  On January 15, 2010, Administrative

Law Judge Sharon L. Madsen denied Plaintiff's application. Plaintiff appealed to the Administrative Council, which denied review on September 17, 2010. On November 12, 2010, Plaintiff filed her District Court complaint.

### B.     Agency Record

Plaintiff (born November 7, 1965) appeared at the agency hearing without representation. She testified that she lived in a trailer with her daughter and disabled son, aged 20 and 14. She needed to move since it had steps and a very low toilet from which she could not get up. She supported herself on food stamps and aid for her 14-year-old child.

Plaintiff completed high school and some community college. She had a certificate from the security academy. Plaintiff had a driver's license and was able to drive. She had previously worked in retail sales as a cashier and in customer service.

Either Plaintiff's sister or one of her best friends came to her home daily to help Plaintiff, who had difficulty getting in and out of the shower and who was unable to lift her arms high enough to put on her wig when her shoulder pain was bad. Plaintiff had lost her hair as a result of stress. She did no household chores although she sometimes warmed food in the microwave or made some soup. She went out occasionally and tried to go to church when she could. Plaintiff tried to remain inside when the weather was cold since cold temperatures aggravated her fibromyalgia. She generally spent her days napping and watching television.

Plaintiff, who was 5 feet 6 inches tall and weighed 243 pounds, attributed her recent substantial weight gain of about fifty pounds to cortisone shots. Plaintiff testified that she was receiving cortisone shots every two weeks for pain. Although her knees swelled badly, she was reluctant to take the diuretics prescribed for her, explaining that she was embarrassed when she was unable to reach a bathroom in time. Plaintiff had severe pain in her knees, back, and shoulders. She experienced severe back spasms. She also experienced leg spasms if she sat for more than twenty minutes at a time. She feared that she would end up like her mother, whose legs had been amputated because of poor circulation.

Plaintiff took Vicodin and Lorcet, which only "took the edge off" her pain, but she was afraid to take OxyContin. If she laid down to relieve her pain, her stiffness increased, causing

1  more pain.  Because she had recently begun to experience frequent falls, her doctor had prescribed
2  a walker.  Plaintiff could walk further with her walker but was embarrassed to use it.  She also
3  used a cane.
4        Plaintiff's skin was frequently so sensitive so that she could not tolerate heavy clothing or
5  even human touch.  She also had severe acid reflux.
6        Plaintiff thought she could sit for twenty minutes and stand for twenty to thirty minutes.
7  She tried not to lift at all.  She sometimes had difficulty remembering what she had watched on
8  television.
9        Plaintiff had been unable to pursue treatment for her depression and anxiety because she
10 was unable to sit and wait at the mental health clinic.  She had panic attacks and was very
11 frightened when driving.
12       **Disability Report.**  Although on other occasions Plaintiff said that she voluntarily left her
13 job following the death of her father, on her disability report, Plaintiff stated that she was
14 terminated from her prior job on January 20, 2007, for disability-related behavior.  (The record
15 includes evidence of California state disability payments in 2007.)  Plaintiff reported that she had
16 back and leg pain, took many medications, and heard voices.
17       In a disability report dated October 18, 2007, Plaintiff explained that she was afraid to
18 sleep because the house might catch fire or she might not wake up.  She depended on her sister to
19 cook, perform housework, pay Plaintiff's bills, and remind Plaintiff to put on make-up and take
20 her medicine.  When her sister did not cook for Plaintiff and her children, they got take-out.
21       Plaintiff reported pain and limited motion in her back and left knee.  She had anxiety and
22 feared that someone would kill her.  Sometimes she was embarrassed by things crawling on her
23 skin that others could not see.  She heard voices in her head.  She became angry easily.  Stress
24 made her want to hurt someone.
25       In her social security appeal, Plaintiff told the agency that she sometimes wet her bed
26 because the pain was too bad to get up and go to the bathroom.   She took 100 Soma and 100
27 Vicodin monthly for pain.  Using a cane helped her walk by taking pressure off her back.
28 Sometimes her leg gave out, causing her to fall.  She had back spasms and could not sit or stand

for very long.  Her medications included Ambien, Soma, Tylenol #3 with Codeine, codeine cough syrup, Vicodin, and Xanax.

According to Plaintiff, her condition affected her ability to lift, squat, bend, stand, reach, walk, kneel, see, remember, understand, follow instructions, and get along with others.  She could walk about ten minutes before needing to rest.  She had difficulty remembering to finish her tasks.  She wore a shoulder sling when her pain became unbearable.

**Third-party disability report.**  Plaintiff's sister, Annette Harper reported that Plaintiff lived with her daughter and disabled son.  Harper spent eight hours a day with Plaintiff, cooking, grocery shopping, cleaning, washing clothes, cooking, and paying bills.  Plaintiff's daily activities included watching television, paying bills, visiting her mother, and taking her children to school.  She had difficulty getting in and out of the bath tub and putting blouses over her head.  Plaintiff had pain in her shoulders and back.  Plaintiff's doctor encouraged her to continue to drive as a means of overcoming her anxiety.

Harper did not trust Plaintiff to administer her own medication, fearing that Plaintiff would overdose herself.   Plaintiff's pain medication impaired her memory, and made her irritable and angry.  She had repeatedly failed to pay her bills.  Harper thought Plaintiff could only go out alone if she was not taking her medication.  When Plaintiff was taking her medication, her mind wandered, impairing her ability to follow directions and complete tasks.

Although Plaintiff had previously been able to handle her household and financial duties, she was now anxious and paranoid.  Anxiety had caused her hair to fall out.  She was easily embarrassed around people and imagined that they were making fun of her.  Plaintiff was afraid of setting her house on fire.  She frequently spoke about hearing noises, he house being on fire, being tired, and being afraid of dying.

Harper opined that Plaintiff's condition had affected her ability to lift, squat, bend, stand, reach, walk, kneel, see, remember, concentrate, complete tasks, understand, follow instructions, and get along with others.  She could walk about ten minutes, then needed to rest for ten to fifteen minutes.  Although Plaintiff could not handle stress and changes in routine, she got along well

///

with authority figures.  Her former employer, J. C. Penney, had fired her for her inability to follow procedures and get along with others.

**Agency interview.**  The interviewer noted that Plaintiff displayed difficulties with understanding, concentrating, and coherency.

**Dr. Santivanez.**[1]  Carlos Santivanez, M.D. was Plaintiff's primary care physician. Plaintiff saw Dr. Santivanez regularly for prescription refills as well as for routine care including family planning, insect bites, coughs, and sore throats.  He diagnosed and treated Plaintiff for lower back pain, shoulder pain, depression, anxiety, and a B-12 deficiency.  On October 8, 2009, Dr. Santivanez prescribed a wheeled walker for Plaintiff.  He repeatedly noted that Plaintiff was sad or tearful.  Occasionally, Plaintiff reported sleep problems.  In July 2006, Dr. Santivanez notes indicate that he referred Plaintiff for an MRI and x-rays of her *right* shoulder but the agency record includes no records of the MRI of any type being administered or analyzed.

On January 11, 2007, the doctor noted that Plaintiff had "just quit her job at J.C. Penney." On March 29, 2007, Plaintiff rated her back pain as 2-3 on a scale of 1-10.  On August 30, 2007, nurse practitioner Cheryl Thomas noted Plaintiff's anxiety and grief following the deaths of her father and uncle, and referred Plaintiff for counseling.  The agency record includes no records of Plaintiff's having received counseling.

Plaintiff failed to attend multiple appointments and on one occasion, left before she could be seen by the doctor.  She frequently brought disability paperwork for completion.

Dr. Santivanez repeatedly provided prescription forms on which he confirmed that Plaintiff had back pain and knee pain.  For the first time on March 16, 2009, he reported that Plaintiff had fibromyalgia in addition to knee and back pain, and that her conditions were worsening.  On November 19, 2009, Dr. Santivanez wrote, "Due to medical reason Patient needs to be excluded from jury duty."  AR 296.  On February 11, 2010, Dr. Santivanez wrote on a prescription form: "Due to her conditions patient is on [*sic*] high risk of falling."  AR 303.  On March 25, 2010, Plaintiff forwarded to the agency a prescription form on which Dr. Santivanez

---

[1] Dr. Santivanez's treatment notes are perfunctory and largely illegible.

5

had written, "Due to her fibromyalgia and chronic back and knee pain Patient is unable to work, she is depressed She is using a walker. Very difficult to get around." AR 305. On April 8, 2010, Dr. Santivanez simply wrote, "Wheelchair #01." AR 302.

**Dr. Fabella.** Internist Emmanuel Fabella, M.D., examined Plaintiff as an agency consultant on February 12, 2008. He identified Plaintiff's chief complaints as arthritis pain in both knees, the lower back, and the *left* shoulder. Plaintiff demonstrated a "slightly antalgic gait,"[2] but used no assistive devices. An examination of her back revealed a mild-to-moderate left paralumbar muscle spasm, which decreased the flexion of Plaintiff's back. The range of motion of Plaintiff's left shoulder was limited. She had patchy hair loss on her scalp.

Dr. Fabella diagnosed multiple arthritic pain involving both knees, the left shoulder, and lower back, likely resulting from osteoarthritis, and alopecia (patchy hair loss), which possibly indicated a connective tissue disease. Plaintiff also had reactive depression.

Dr. Fabella opined that Plaintiff could lift and carry no more than 20 pounds frequently and ten pounds occasionally; stand and walk one hour in an eight-hour work day; sit with no restrictions; and climb, balance, kneel, and crawl only occasionally. Plaintiff could walk on uneven terrain only occasionally and was restricted from climbing ladders or working at height. She had no limitations of hand use, manipulation, or environment.

Although Dr. Fabella's report indicated that he had ordered x-rays, he did not discuss the results of the x-rays in his report, apparently expecting Dr. Divarkaran's report to stand on its own.

**Dr. Divarkaran.** Radiologist T. Divarkaran, M.D., evaluated x-rays ordered by Dr. Fabella. Other than an exaggerated lodotic curve, Plaintiff's lumbar spine was normal. There was mild narrowing of the medial compartment joint space of Plaintiff's left knee.

**Dr. Izzi.** Dr. Roger A. Izzi, a clinical psychologist and neuropsychologist conducted a psychiatric evaluation as an agency consultant. Plaintiff reported that her chief complaint was depression. Dr. Izzi diagnosed:

---

[2] An "antalgic gait" is a gait assumed to counteract or avoid pain. *Dorland's Illustrated Medical Dictionary* at 90 (28th ed. 1994).

6

| | | |
|---|---|---|
| Axis I | Bereavement | |
| Axis II | Deferred | |
| Axis III | Per medical specialists. Pain. | |
| Axis IV | Psychosocial stressors: Unemployment and financial concerns. | |
| Axis V | Current GAF: 65 | |

AR 262.[3]

Dr. Izzi summarized his functional assessment:

> The claimant was employed at J. C. Penney. She stopped working when her father died in December 2006. She stated she "went into a depression." Therefore, the claimant appears to be involved in a grieving process in response to a loss. This would be a normal response and does not represent a separate and distinct clinical depression. Her effort on the mental status examination is questionable. Her present symptoms and complaints do not exceed a slight degree in intensity. Therefore, there would be no functional psychiatric limitations.

AR 262.

**Dr. Ginsburg.** As an agency physician, Brian J. Ginsburg, M.D., performed the physical residual functional capacity assessment. He opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; could stand, walk, and sit six hours in an eight-hour workday; had unlimited ability to push and pull; could occasionally climb ramps and stirs, balance, stoop, kneel, and crouch; could never climb ladders or crawl; had limited ability to lift overhead; had unlimited ability to handle, finger, and feel; and had no visual, communicative, or environmental limitations. Dr. Ginsburg emphasized that Dr. Santivanez diagnosed and conservatively treated Plaintiff's arthritis without any x-rays, but that the x-rays ordered by Dr. Fabella revealed no basis for a diagnosis of arthritis in Plaintiff's knees, lower back, or shoulder.

---

[3] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id.* at 34. The first description in the range indicates symptom severity; the second, level of functioning. *Id.* at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. *Id.* at 33.
  GAF 65 is at the middle of the range GAF 61-70, which indicates ""[s]ome mood symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

**Dr. Garcia.** Agency physician Archimedes Garcia, M.D., performed the psychiatric review technique. He opined that Plaintiff had an affective disorder that was not severe. Dr. Garcia did not opine on Plaintiff's functional limitations.

**Vocational expert.** Jose Chaparro testified as vocational expert. Chaparro testified that his testimony was consistent with the Dictionary of Occupational Titles. He reported that the Dictionary of Occupational Titles classified Plaintiff's prior work, cashier-checker as light, semi-skilled work, SVP 3. Plaintiff performed the job as medium work. Many of Plaintiff's skills were transferable to similar retail occupations.

For the first hypothetical question, Judge Madsen directed Chaparro to assume a hypothetical person of the same age, education, and work background as Plaintiff, who was able to lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk six [hours] with occasional stooping, crouching, crawling, kneeling. climbing, and squatting; and could occasionally reach overhead with her left arm. Chaparro opined that such a person could perform Plaintiff's past work.

For the second hypothetical question, the ALJ directed Chaparro to assume that the individual described in question one was restricted to simple, routine tasks. Chaparro opined that such a person could not perform Plaintiff's past work, but could perform the work of cashier II (DOT Code 211462010), which was light and unskilled. Nationally, 1,797,000 cashier II jobs were available, and in California, approximately 181,000. The hypothetical person could also work as a fast food worker (DOT Code 311472010), a light and unskilled job with 1,944,00 jobs nationally and about 171,000 to 172,000 jobs in California; or as an office worker (DOT Code 239567030), a light and unskilled job with 7300 to 7400 positions nationally and 1000 to 2000 positions in California.

For the third hypothetical question, the ALJ directed Chaparro to assume that the hypothetical person was able to perform sedentary work, lifting ten pounds frequently and occasionally, sitting six hours; standing and walking two hours; occasionally stooping, crouching, crawling, kneeling. squatting, climbing, and reaching overhead with her left upper extremity, and limited to simple routine tasks. Chaparro opined that such a person could not perform Plaintiff's

prior work but could perform the world of sedentary, unskilled work. Examples of possible jobs included call out operator (DOT Code 237367014), with 13,000 to 14,000 jobs nationally and 1000 to 1200 in California; escort vehicle driver (DOT Code 919663022), 26,000 jobs nationally and 2000 to 3000 in California; and microfilming document preparer (DOT Code 249587018), 24,00 to 25,000 jobs nationally and 3000 to 4000 in California. All three of these jobs were sedentary and unskilled.

For the fourth hypothetical, Judge Madsen directed Chaparro to assume that the individual in the third hypothetical question would need to take two to four breaks daily for about thirty minutes. Chaparro opined that no jobs would be available for such an individual.

## II. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

| | | |
|---|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. | |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. | |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. | |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. | |

| | | |
|---|---|---|
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 12, 2007.  Her severe impairments were degenerative joint disease of the left knee, obesity, lumbar strain, fibromyalgia, and depression.   None of these impairments met or equaled the requirements of a listed impairment.

Plaintiff retained the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; to sit, stand, and walk for six hours in an eight-hour day; and to occasionally stoop, crouch, crawl, climb, kneel, squat, and reach overhead with the left upper extremity.  She could perform simple routine tasks.

Plaintiff was unable to perform any past relevant work.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

## III.   Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

///

the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### IV.     ALJ's Rejection of Opinions of Dr. Santivanez and Dr. Fabella

Plaintiff contends that the ALJ erred in failing to provide specific and legitimate reasons for rejecting the opinions of Dr. Fabella and Dr. Santivanez. The Commissioner counters that the ALJ properly evaluated the medical evidence. Following a complete review of the record and careful consideration of the hearing decision, this Court concludes that the ALJ's determination of Plaintiff's residual functional capacity was properly articulated and supported by substantial evidence.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.

28 C.F.R. § 404.1527(d). Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

In determining Plaintiff's severe impairments, the ALJ generally accepted the diagnoses of Dr. Santivanez, Plaintiff's only treating physician, and Dr. Fabella, an examining physician, finding left knee degenerative joint disease, obesity, lumbar strain, fibromyalgia, and depression. In describing Dr. Fabella's report, the hearing decision carefully articulated information related by Plaintiff and Dr. Fabella's actual observations upon examination. Finally, Judge Madsen took into account that the x-rays ordered by Dr. Fabella, the results of which were not included in his report, indicated that Dr. Fabella's assumption that Plaintiff's joint pain resulted from osteoarthritis was wrong since the x-rays showed her spine to be normal and her knee to be nearly so.

The ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Since neither Dr. Santivanez not Dr. Fabella rendered their opinion with knowledge of what x-rays of Plaintiff's back and left knee would show, neither opinion was supportable. Further, an ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Because their diagnoses were based on Plaintiff's subjective description of her condition, but the x-rays failed to support the subjective description, the ALJ properly disregarded the diagnostic opinions of both Dr. Santivanez and Dr. Fabella.

///

Other than the March 25, 2010 conclusory statement, written on a prescription form, that "Patient is unable to work," Dr. Santivanez offered no opinion on Plaintiff's residual functional capacity. AR 305. An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social Security Ruling 96-5p. "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

Dr. Fabella's opinion, rendered without the benefit of the x-rays he himself had ordered, relied largely on Plaintiff's own characterization of her current health. Dr. Divarkaran's evaluation of the x-rays revealed a complete lack of objective support for Plaintiff's subjective claims.

When a physician's opinion is inconsistent with clinical findings, the ALJ must resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ properly observed, "Dr. Fabella's limitations on standing and walking to one hour are not consistent with the lack of neurological deficit and minimal x-ray findings. He appeared to base these restrictions on subjective complaints instead of the objective findings in totality." AR 20.

This Court agrees that the ALJ appropriately favored the objective indications of the x-rays and Dr. Divarkaran's evaluation of them over the opinions of Dr. Fabella and Dr. Santivanez, which were based on Plaintiff's subjective reports.

**V.     Failure to Offer Plaintiff Opportunity to Cross-Examine Vocational Expert**

Speculating on various lines of questioning that might have modified Chaparro's testimony in her favor, Plaintiff contends that the ALJ erred in failing to offer her an opportunity

///

to cross-examine him. The Commissioner responds that, since the right to cross-examination depends on Plaintiff's having requested cross-examination, the ALJ did not err.

A disability claimant is entitled to such cross-examination as may be necessary to fully and accurately develop the facts. 5 U.S.C. § 556(d). The ALJ has the discretion to decide whether cross-examination is necessary. *Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983). When a disability claimant does not request an opportunity to cross-examine an expert, he may not complain in an appeal that he was denied the right of confrontation and cross-examination. *Richardson*, 402 U.S. at 404-05.

## VI.     Conclusion and Order

For the reasons discussed above, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits. The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   June 20, 2012**              /s/ **Sandra M. Snyder**
                                                              UNITED STATES MAGISTRATE JUDGE